Mr. Salzberg? Good morning Your Honor, may it please the Court? I'm Robert Salzberg, I happen to be with the government. I'd like to be with you for 10 minutes for a little while. That's great. Your Honor, the government's position here is that the District Court may enter into a judgment of acquittal for Mr. Caraballo-Rodriguez. Let me ask you, you know better than I do, about our case laws all over the ballpark. What must the government show to sustain a drug conviction, a drug conspiracy conviction under Roe v. Weston? Well, certainly we know about the elements of conspiracy. Right, I understand that. As to what the crime was, it has to be a knowing effort to distribute the possessors of cannabis, should it be cocaine, which is what was alleged. And all of the cases have taken a pretty literal, the ones that have gone the other way from the government's position, all the way back to Cooper and Shepard's, have taken a real literal view of this. The person has, there has to be evidence in that the person knows it was drugs. And while inferences are allowed, it seems like sometimes we go away from that. The question is, okay, so there's got to be something, a plus factor. What are some of the plus factors that we should have in order to try to say, okay, what can we do to make this area of the law coherent? We as a panel. Thank you very much. Well, certainly we have not yet in this case, because there hasn't been an opportunity, we haven't requested an in-bed consideration yet. If this court were to decide to go in-bed, you will hear no complaint from me. I think that would be most welcome. This has been an area that has posed tremendous difficulty to law enforcement for many years. And only in this circuit, this circuit, as your Honor says, has this meandering course over many years. I'm not criticizing the Cooper case. The last time I had the privilege to stand here and address this issue was in the Borea case. And Judge Fischer then began the argument by simply asking me, where did we go wrong? And my answer to that question was Wexler, that that's really where this meandering course begins. So the best way to sort all this out, I do think, would be in-bed consideration. In terms of what the government has to prove, if I can explain that, and then say what the plus factors, if your Honor wants to call them, that have worked in the past. The government must prove beyond a reasonable doubt that each defendant knew the purpose of the conspiracy. And the purpose of the conspiracy being to distribute, to possess with intent to distribute cocaine in this instance. What our dispute has always been about, with this court's decisions dating back 25 years, is the standard of a view on a field. Because once a jury makes that determination that the government didn't meet its burden, what is the standard of a view on a field? And how do we look at what the jury did? It seems to be that in the area of the law, what we do vis-a-vis knowledge is a bar that's higher than in other areas of the law. Exactly. And the reason I think that's played out the way I try to explain it, and you and I will decide whether we're correct or not, is that this court, in some cases, has not been faithful to the standard of a view. The standard of a view is, take all inferences to favor the government in this instance, and decide whether there's a reasonable inference that supports the verdict. And what this court has done in a handful of cases is accept reasonable inferences that don't favor the verdict, which may be perfectly reasonable. And what this court has said, and what the Supreme Court has said many times, is that doesn't matter. It doesn't matter for the other reasonable inferences. Let me ask you a question. There was expert testimony here that was 130 pages of direct and cross-examination regarding what these types of couriers know and do and don't know. Judge Roof essentially took that off the table, if you will, by saying that in the absence of any other evidence from which a jury could permissibly draw an inference or not, the court will not permit an expert's conclusory statement of that defendant's mental state to tip the balance. I'm just curious of your take on that aspect of the opinion that we have before us, where a district court, and maybe I'm throwing a softball. I am throwing a softball. That a district court, after the jury has heard evidence that hasn't been objected to, and that no one's contending was impermissibly admitted, district court basically takes it out of the equation. I just don't know. You haven't raised this. And I'm wondering whether there's some flaw in my thinking that this is a bit unusual. I believe we did raise it, Your Honor, in our brief. I know the brief served my mom. But in there, we did say that the district court committed error in that argument's analysis as well as other parts. But what the district court did was it relied, and we have some citations in our brief, it relied on a string of cases that's unique to the Second Circuit. What the Second Circuit has said, essentially, expert testimony should not be allowed to tip the balance. And that is wrong. It hasn't been followed by any other circuit. It certainly hasn't been followed by this circuit. Well, but even if that's the case, a motion for acquittal, taking it, I mean, it's one thing if you say, oh, okay, we have the trial, and I admitted that. You know what? I'm going to say that was plain error. I shouldn't have admitted it. Even then, you grant a new trial. Well, that's right. I mean, that's what we would do, plain error and say, okay, new trial. But to say, okay, I'm taking that out. The jury heard it. But you know what? I'm pulling it out and saying, kind of absent that, that it wasn't my fault. And that's wrong. She never held that it was improper to omit the evidence. What she said is. . . And it was not objected to. That's right. What she said is, I will not allow this to carry the day. And that's wrong, because it was very powerful expert testimony that said that these couriers are generally people who know what's going on and would be trusted otherwise. And the jury could accept that. Absolutely. And getting back to Judge Hammer's question about the plus factors, you know, we don't think plus factors should exist. We think that's a mistake in this one unique area of the law. But in the cases in which the government has prevailed nonetheless, in these types of cases such as Borea, there have been factors that have carried the day. In Borea, it was a co-conspirator's statement. It essentially dimed out the part of Borea as being involved. In other cases, it was the ways of involvement. Recently, the Claxton case, the closest. . . Yeah, the Claxton had. . . There were brothers involved. Yeah. There were statements that my brother said. Yeah. Now, here, and I don't want to use the term plus factors, but I will, there are two things about this case that the government often. . . Yeah. I'll just throw out a term, and I'll show you what it is. Well, there are two facets that the government offered in this case. Facets, not plus factors. Facets, that's right. And its continual efforts to work with this court's precedent can be helpful if there are any considerations on that. But there are two things we did differently because we're so clearly trying to focus on this. You sound paranoid about how we do this. That's right. Well, it does. It affects the decisions. It affects our own decisions, which is a whole other ball. But with regard to how we tried this case, one thing we did was offer this expert testimony. That feature is not present in any of the prior cases of this court, in Dover, or Thomas, or Salem, or any other cases that are cited in the case. And that expert testimony is important. Here we have an experience, extremely experienced. But expert testimony ordinarily can't be used to supply the mental state. That's something I've objected to, ordinarily. Correct. But what it can be used for is for the jury to infer a mental state. The expert, Courtney Watson, who had no judgment at all with Judge Ambrose, sat on the panel with Watson. I'm not a jury judge. You're a jury judge. You're very sensitive to a lot of stuff. I'm very sensitive to a lot of stuff. So he has a very interesting panel. And he did well. But with Ambrose, the mistake that Ambrose made with Watson was to ask the agent, what was this guy's mental state? And he gave an opinion as to that, and his court clarified the law. The government is allowed to enter any evidence about the general practice that acknowledges people involved in the drug trade, as long as it doesn't draw that final inference of the government, did not hear his lawyer say there was no objection. It was close. They know. They should know. They know. They should know. They should know. They know. But to address exactly that sort of testimony in other cases, like I don't know if it's being studied a lot in a brief, one very important factor this court has looked at, and it's true here, is whether the agent was involved in the investigation or even knows the defendant on trial. And here, basically, nobody could look at him and say, well, he really knows what this fellow caught on. No, but once he says, I mean, and I don't judge. We've studied the Gutierrez case. Once he says something that, hey, he knew or should have known, you might as well say that, because he says they know or should have known, that's putting yourself into the head of the defendant here. If this came up to us on plain error review, I would bet we would say that that wouldn't have been permitted. However, all of the, you know, they hire these people carefully. They're not just anybody because this is high risk. You know, that kind of thing. But I think Judge Amber has a point. But this isn't before us. I may respectfully disagree, but one point I'll add is that should have known, which is what the agent said, doesn't get us there. And as the jury agrees, should have known does not cater to knowledge or lawful blindness. Let's go back to the facets. If you look at some of our court's cases, which is interesting. What was sufficient in EFHA when the drugs came from a vehicle that the defendant owned and operated? Not our case here. Direct statements by co-conspirators. Again, Judge George, opinion of Ramos, that he knew about the existence of clean drugs. D&DS says just about the opposite. He didn't know, but he did know. So it's just doesn't help you there. Being charged with unloading a truck was turned out to contain drugs. And Billy Abigail's co-conspirator statements, no co-conspirator statements here. They were expressly identified as a member of a conspiracy by the Roboto in Claxton. That's not here. And so what the only thing that does come back to Facebook's Bassowitz testimony, that's it. And he's out there saying, here's how these people operate, just so we understand. I've been doing this for a long time. Here's how they operate. And when he says something like, they knew or should have known, it really throws up all kinds of red flags. The moon iron is actually much more. Okay. And there are two things. And I may need to ask for an open book. Yeah, this is an important case. Let's add another five minutes. Thank you, Judge. Two things. First of all, if I didn't have to work with those old cases, there is a similarity with this case, and both iFelice and Luria. The control is the key. In iFelice, the fellow has the drugs in his truck, even though he never gets out of the car, never opens the truck. And this court says that control can be used to confirm knowledge. But Luria is very similar. The drugs are hidden in these piles of rotten food, and all Luria does is get in the truck to take charge. But he's being given control of this truck that includes it. Yeah, but Luria was driving the truck with the car here, and the guy who's going north is another person. Yes, he is. But here, Carvalho-Vargas, even briefly, takes control. He is left by himself at the Cordero. He takes the suitcases. Cordero has gone off with the other fellow to the parking garage. At that moment, Carvalho-Vargas has exclusive control of these trucks. That's a good point, because you know that there are drugs in there. And that's where we get to the inferences, because a reasonable jury can infer that there's cocaine in these two suitcases worth $2.5 million, and no one is going to put anybody in that position of having exclusive, unmonitored control of those two suitcases unless he knows what's going on and he's a trusted lawyer. I'm going to show you how to do it. Well, I know the gentleman does not take control. It's hard to explain. I don't know if you're very sure how to draw it. But I have drawn this distinction over the years. Cordero is trying to take control of the drugs. He has the money, and he's been in the suitcase, and he feels that these are things he's doing for the drugs. He says there's nothing in there. The problem in these cases, obviously, is that there are multiple reasonable inferences where Cordero has counted the money out of the suitcase. It's a reasonable thing. He knows what it is he's about to receive. It's also a reasonable place to say maybe he thinks it's something else. But on review, the Court of Appeals has to accept that if it was a verdict in here, the control, the collarbone of the suitcase, the exercise to open this very valuable stash has to be there. I would say it's a reasonable inference. But it should wind a front. The other thing is, and here again I'm throwing softballs, but I will. I mean, these guys get on an airplane. They come. They go and pick up the suitcase that's got the bad stuff. Whatever it is, it's not the isolated instance of a person in a car or a person in a truck or something where you're just not sure of the context. It seems to me your best argument is this is a very distinguishable situation because you do have the expert, but even without the expert, you have these people who clearly something is awry here. You come with the understanding as a juror that there's something going on, and it's just a question of what inference you get. Exactly. I mean, I can't help but wonder. I guess it was worth a look at this. But that's the softball. Now, the hardball is they're all like that when they're acquitted. I mean, look, Thomas, Salmon. I could go on and Wexler. I mean, you look at those, they should know. Well, again, obviously I don't agree with the opinions, but Wexler, again, the gentleman is going out across the street, never touches the drugs, never takes control. Salmon, it's unclear what this guy fits electric does. He's standing next to the trunk. There's no evidence looking out for Lisa that it's his trunk or his car. Thomas, he does not take control. Thomas, the gentleman goes into the room to get the suitcase, but the agents have left an empty suitcase, and so being a smart guy, he just leaves. I mean, Thomas would be this case if they left a suitcase full of cocaine in there Well, there's no doubt he knew there was something involved in a list of activity, but this did not, quote, prove the purpose of the agreement, which is the possession of a controlled substance with intention to distribute. I mean, he's taking it fairly literally. That's right. So these cases say that he knows something unlawful, but we can't say it was drugs as opposed to something else. And what I'm saying is... And so here, no doubt, kind of part of the wonder is he knew there was something going on, but even his uncle, his cousin said, I've never saw this guy before, and so I can't say he was ever involved in... I don't know what he did. There's one inference, Your Honor, that people know what they're doing, that when somebody is transporting two suitcases of cocaine, they know what it is. There are other inferences. You can have an inference that he thought it was bearer bonds or cash, which is what, I don't know, what I'm trying to argue. So we'll try to debunk your typical prophecy. We both agree. That's right. So you have to accept the inference that favors the verdict, as long as it's reasonable, or to use the Supreme Court's recent term, beyond bearer rationality. It's beyond bearer rationality that if somebody is transporting two suitcases of cocaine, they think they know it's cocaine. But I need to get to the really important point here, if I may, Your Honor, which is worthwhile in this, because that is the other facet, if that's the word we're using now, that does not exist in any of these other cases. And, in fact, in many of these decisions, there were cases where the class of this court says, well, they didn't bother to ask for a little bit of guidance instruction. And in this case, we did. And this, again, is we did not include the actual knowledge in this case. I don't think there could be any serious debate. But Judge Ruth dismissed that in two paragraphs. She did. And we take exception, because all she focused on, and we have no record of looking at it, is when Mr. Carl Barral Rodriguez picks up the suitcases, and she says that it happens immediately. I'm not going to infer what the blind is from that. The mistake is, and this goes to Judge Wendell's question, the mistake is not looking at the entire enterprise. He got on the airplane. He got on the airplane and took a flight. Remember, there were two suitcases. The king did not pack. But when the cargo boarded the airplane, that he was going to take off of the conveyor belt. And the other guy picking up the suitcase says it's common sense that it's drugs. So maybe. Exactly. And the jury didn't draw the inference that anybody would do that. Does Diaz's testimony, is that a facet that makes this different, or do you think that's pretty standard? I think it's helpful. I mean, he testifies as to what his knowledge and understanding was when he was getting paid. And the jury can infer that when we have Carl Barral Rodriguez, who deals with the same guy, makes the same calls at the same moments, and does the exact same things that the other gentleman does, then they're thinking the same way. Let's go back to your role for broadness. Judge Roof said, nothing in the evidence shows that Carl Barral Rodriguez was subjectively aware of the high probability of the fact in question, or that he deliberately avoided specific knowledge of the contents of the suitcases. Okay, let me say this to you. Many of all of us, and this is called ethical privilege, have the benefit at some point or another of traveling on commercial aircraft. And so imagine that you have a flight scheduled. You're going to go to San Francisco next Monday. And somebody calls you today and says, there are going to be two suitcases on that plane assigned to you. You don't have to pack them. You don't have to deliver them. You'll be on the plane. And what I need you to do when you get off that airplane is just go to baggage claim and pick up those two suitcases. What is your reaction at that moment? I assume that everybody in this courtroom, their reaction is to pick up the phone. You're actually great. So what is all those cases that don't go to work? So what is willful blindness? All those other cases, this is the first in which the government obtained a willful blindness instruction. And it says it in all of these other cases. That's why we asked for it here, because we're trying. We live in the Third Circuit, and we're trying to address these cases appropriately. This is the first case. Now, we know what willful blindness means, which is that you don't know the fact, but you know the high probability of the fact, and you willfully take steps not to find out. You're just deliberately ignorant. This is a classic example. If you weren't that blind, I think one can conclude that there's a high probability that there's not a bomb in that suitcase. There's nothing there. Can I ask the question again? You don't know what willful blindness, although you could say it's an outlier. How do you explain Ida Rube? Well, Ida Rube, if they had had a willful blindness instruction, perhaps things would have turned out differently. Now that I'm focused on this part of it. What she quoted was, what Judge Rube quoted, was Ida Rube. The second part, that he's deliberately ignoring a specific knowledge of the contents of the suitcases. Here at Ida Rube, he knows what he's looking for. But again, the jury was not instructed on the willful blindness theory in Adobo. The case that actually he is controlling here from his court is Caminos. This was a 1985 case that he signed. Caminos, the gentleman has some kind of figurine delivered to him in his work. And that's his job, is to accept this thing, which is filled with cocaine. And he says, I didn't know you had a story. I want to talk about it. Rube's story is he's an art dealer, being hired to learn art from Brazil. And he's paid $400 to do that. And then he's given a $650 fine ticket, which is similar to this case, to go to the police. But we find out what's going on, because there's a delay in it coming in. And this court affirms the conviction on the basis of willful blindness. And even more interestingly, the case that relies on from the Ninth Circuit, called Super Squad, which was a 1982 case. And this is over at Bruce. And Super Squad is this case. Super Squad is somebody in Thailand who's given a plane ticket of money to fly in a company suitcase. And when this court in Caminos relies on Super Squad, it says, well, this case isn't as blatant as Super Squad in terms of willful blindness. Police don't think it's enough. Well, this case is blatant. And you take a flight from wherever you go, a known source, according to the expert, of drug trafficking. And you're told to use a suitcase, which is whatever you pick up. And you literally take that flight, knowing everything you know about federal laws, about modern transportation. Willful blindness. I guess the jury can infer from Diaz's testimony that Carvalho-Rodriguez wasn't doing this for his health. Of course not. Well, Carvalho-Rodriguez has no baggage, no carry-on, $33 in his pocket. And you know, one of the interesting things, and I think I'm entitled to more than that, but if I can make one more observation, is that Mr. Warren, who is an extremely capable attorney,  Because when he argues to the jury in closing to try to get it to accept an alternate inference, is that there was cash in the suitcase. That he could have thought it was cash and not drugs. And that actually might not free somebody of a conspiracy charge, because cash is part of the operation. And he has to get around Diaz's testimony. Diaz says, I carry cash on my body for years. And I knew when I picked up this suitcase, because of the weight, that this was drugs and not cash. But the interesting thing is, of all the hypotheticals that this court, in these decisions we're talking about, has put out over the years, computer chips, bear bonds, you know, other things that there might be in there. It's always very interesting to me, looking at the record of these cases, that no defense attorney ever tries to convince a jury of those inferences. Because you know, jurors are very smart, sensible citizens who make good decisions. You can't sell it to them. And if you can't sell it to them, how can it be under the standard of review to say that the inference they did accept, that he knew it was drugs or that he was willfully blind, is not really rational to use the test that we have built behind this event, that even under the prior precedent of this court, that there's more than enough in this case to justify the conviction. And if I get to do this again in bank, I have no idea if it can be composed of me. Thank you very much, Your Honor. Thank you. Mr. Warren. May I please record? I think it's good for Warren. I hope it doesn't get in the way of this case. And where do you all want to start? Let's start with the expert testimony. I mean, it was never objected to. And you were trying to make good use of it by noting that the proffer, or what you thought the expert was going to testify to, was something different from what he did testify to. But there was never any motion to exclude it. Then I'll clarify, Judge. I was giving an expert report where the man specifically stated in his expert report that they are not told. They, indeed, are not told. So there was a little kick in the back when the man got up there and said something completely different from what he wrote. So arguably, maybe it should have been stricken. It should have been stricken, but Judge, just take a real quick look at what the guy actually says, okay? You keep talking about this expert opinion. Judge Anvil, you're 100% correct. When he starts offering an opinion as to what my client's subjective mental state is, you have clearly crossed the line. Now, I understand Watson says you can marry it up with some of the factual predicates in your case. But crossing the line, if it's not objected to, if there's no contentious player, the jury heard it, and no one's... But, Judge, what exactly... No one's saying that they can't hear it. But, Judge, here's the exact expert opinion right here. Well, it's pretty... there's a lot. No, I'll read it to you. It's in my brief, page 8. They are sometimes trained not to say that... Now, this is... I'm sorry. This is... They are trusted individuals. The couriers, if you're transporting a significant amount, their addresses, their family, their information are known to the person. I mean, I think Jay did my brief and Judge Luke quoted from it. And they have to be trusted because we announced that they carry back and forth, both if it's cash, depending on which direction you're heading, or if it's drugs. Now, for... There's six pages, but there's 90 pages of testimony. I understand. Me going, hey, you said one thing, and now you're saying something completely different. Now, that's... that occupies a lot of... I'll go directly with it. The first problem you have with this is what do you do with Day of Deas' testimony? This guy is saying, in his expert opinion, these fellows are told. Day of Deas repeatedly testifies, I didn't know what was in there. Day of Deas got up at a change-of-plea hearing and when asked what he knew, if he knew what was in the suitcases, said no. It was the prosecutor, and this is, again, quoted in my brief, it was the prosecutor who got up there and started using terms like common sense, weight of the suitcases, that got Day of Deas to say the stuff which induced Judge Ruth to take his guilty plea. Alright? So the first problem you have with it, from the government's perspective, in my opinion, is your own witnesses testifying in a manner that contradicts what your expert says. Now, I understand that juries need to sort out the inconsistencies, but here you have a situation where the expert opinion is flatly contradicted by the courier, whose testimony they claim, from an extrapolative standpoint, puts knowledge in my eyes. Except Deas says, I pick up the suitcase, it's common sense. Yeah, but common sense came from Frank Lieber at the change-of-plea hearing. I know, but the jury heard it from his mouth. The fact that we're arguing over it means the jury may have heard the arguments too, but they sorted it out somehow. Well, inferences have to be reasonable, Judge. Okay? Okay, but there could be reasonable inferences. The fact that there is an alternative reasonable one doesn't make the other one reasonable. Well, I don't think we have to stand up and say one thing under oath at a change-of-plea hearing, completely flip-flopping, the prosecutor feeds in the right words to get a guilty plea changed. But you pointed that out. Okay. Well, all right. Let me ask this question. When Mr. Basowitz, Officer Basowitz, stated that they know, or should have known, that it's drugs, why wasn't there an objection at that point? I can't object because I was taken aback by him completely flip-flopping on his opinion. That's the honest truth. All right? Should I have sat down and tried to strike it? Yeah. Obviously, I should have. I didn't. The question is I say, to me, the real issue in this case is whether or not Basowitz's testimony can provide us something more than you guys talk about in Bowie and Claxon. That, I think the district... When you look at this case, I mean, that's the only something more I can really think of. The district, and by the way, Judge Roof, I mean, he spent a lot of time with this, and at the end of the day, that was her question. Her question was, what can I do with this expert testimony? Can this expert testimony tip the balance and essentially get out from under the rulings and, I mean, I can trace myself, Mr. Goldberger, ironically, out in the hall, and this was his case back in 1988, and Judge Rooker's opinion, it's been around for 25 years. What is the something more? The law is what the law is, and this panel is bound by it. So to me,  The question is, what are we bound by? I think we're bound by, in this case, Wechsler, Claxton, the something more, I mean, the something more was a co-conspirator's statement that it was the defendant's job to offer up the drugs. That put drugs in the guy's head as opposed to some other form of contraband. In Claxton, the something more was the guy is part of the organization. That was the something more that tipped the balance in Claxton. You don't have that here. The co-conspirator testimony actually undercuts the argument they're making here based on the expert testimony, and I won't go into it again. But take a look, and this is more, do we need the something more on the roof of blindness? Well, on the roof of blindness, I think you've got to start with this. The government makes a lot of assumptions. There's absolutely no, there's no evidence that my client had ever been in the United States. There's no evidence that my client had ever flown on an airplane before. There's no evidence that my client had a return trip ticket bought to go back to Puerto Rico. The only evidence the government presented is he got up there, paid cash, flew in, by the way, picked up the suitcases consistent momentarily lifting them off the baggage carousel and wheeling them out. That's their evidence. And he was called, he was also called by the same person who called their ideas. He was called, again, yes, he was called, but there's no evidence as to what was said to my client. And if you and I can actually quote from what David Diaz testifies was told to him. David Diaz testifies that this man called him out of the blue. The expert witness says, in my opinion, these guys are never called out of the blue. So David Diaz says this guy calls me out of the blue. And there's nothing from what was told to David Diaz that allows him to conclude that he's transporting drugs. So I don't think you can take David Diaz as whatever the conversations are. How do you sit there and say that information reported to David Diaz which did not give him the knowledge that the government is seeking to attribute to my client came from a conversation that they can't even tell me what was said. I mean, that's what we're dealing with here. What applies to me, and Prometheus is a prime example, maybe the smartest thing my guy did was not talk. Because the minute these guys start talking, they have created a situation where if the jury didn't believe him, now you're allowed to infer that they're lying and hence they're culpable now. So perhaps the smartest thing my guy did was not say a word. What do you have here? You don't know what was said to him in Puerto Rico. You don't know if he was here for one day. You don't have any evidence he was flying back that night. You don't know what, if anything, was told to him. You don't know if he tried to get into the suitcase but it was locked, as Judge Roof says. You don't know if he was lied to, deceived, manipulated, because I got Bayeswood to admit that these drug organizations, they lie, they deceive, they manipulate. Because he didn't protest when they were making up a story as to what they were doing. Their evidence is pretty weak on that too. It just says we concocted the story. Now, the other side was in the suitcase. That's what Dave Dean says. So it's pointed in my favor. Because Mr. Lieber says, now, why did you all concoct this story? Why didn't you know it was in the suitcase? It's the one that opened it up on the table by the lawyer. Who got all this cocaine? To me, I think that's the answer to your opinion because here's really what it is. And this is what Judge Roof said. He said, by analogy, we used 704B. And did you do any... I don't see maybe a sentence or two in your briefing where you said, okay, that's the right, you know, we support that. But... Yeah, I did that in a sentence when I mentioned ethics 45. I'm not sure if it's relevant. Yeah, I remember  Anyway, I talk about what I just wrote about in this, and... Well, what the government initially says is that the concurrence by Hitch Newman in the second circuit case didn't even garner the majority. And then I point out that, well, actually, that concurrence is not a law in the second circuit, okay? And the second circuit in that Duarte case that I cited goes through this and talks about... It's one thing for an expert to look at physical documents, things like that, and often opinion. It's another when an expert starts interpreting conduct, and based on that conduct, it gets to a formal state. But where does a district court get the ability to sua sponte excise expert testimony after the jury has heard it, taken it into account, no objection, no contention on appeal, that it was a plain error to admit it. There's nothing in the record that says anyone saying it was wrong. She didn't excise it. She didn't admit it to tip the balance because that's the nature of it. That's because all he's getting up there and saying is, you know what, it's supposed to be. As long as it's admissible and permissible. So Watson, it would have been plain error on certain scores, but nobody objected to it at all. So it's there, and the jury heard it, they took it for what it was. It was there in the second case I cited where they got up there and the guy said it was fair, and he said it was fair. And what the judge said was you know what, it is fair. In  case it is fair. It is fair but they say they should have gotten into it more. This is basically what I put on my brief. Starting page 235, second sentence 235.  says  . ат.. ..